UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-61640-CIV-DIMITROULEAS/Snow

NOELIA ESCOBEDO,

        Plaintiff,

    vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits.  The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on March 3, 2004, alleging disability since February 8, 2003, as a result of pain resulting from a fall at work.  The application was denied initially and upon reconsideration.  The plaintiff then requested a hearing which was held before Administrative Law Judge Robert Rae on February 12, 2007.  The

Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council, after considering additional evidence, denied the plaintiff's request for review on August 19, 2008.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. <u>FACTS</u>

The plaintiff was born in Mexico in 1956 and has a high school equivalency education, but without diploma.  Her past relevant work was as an agricultural worker.  The plaintiff last worked on February 8, 2003, when she was injured during a slip and fall at her place of employment.

The medical record reflects that at the time of her fall, the plaintiff struck her head and lost consciousness.  She received emergency treatment at Hendry Regional Corporate Health for the head injury, as well as for cervical, lumbar and right shoulder strain.  In the weeks that followed, the plaintiff complained of headaches, fatigue, dizziness, joint pain, muscle spasms, and pain in her back, neck, right shoulder and scalp.  A February 27, 2003, MRI of the plaintiff's brain revealed three tiny hemispheric white matter lesions, but otherwise was normal.  The plaintiff was treated at Hendry through March 11, 2003, at which time the

plaintiff's therapist indicated that she was to remain off work until cleared by a neurologist and orthopedist. (R:123-37)

On April 29, 2003, the plaintiff presented to neurologist Laszlo J. Mate, M.D.  The plaintiff told Dr. Mate that since her accident, she had suffered from constant headaches, occipital pain, neck pain and low back pain, as well as pain in her right arm, tail bone and left hip.  The plaintiff also stated that her memory was poor and she had difficulty reading.  On physical examination, the plaintiff exhibited marked tenderness in the cervical paraspinal and trapezius muscles bilaterally, as well as in her low back and left hip.  Gait, including heel, toe and tandem walk were normal. Dr. Mate noted that an MRI of the plaintiff's cervical spine showed bulging discs at C5-6 and C6-7. His diagnostic impressions were post-concussion syndrome and cervical and lumbar sprain versus radiculopathy, and he prescribed Bextra and Skelaxin.  Dr. Mate stated that the plaintiff was not able to resume work.  (R:149-50)

Dr. Mate ordered a lumbar MRI, which was performed on May 7, 2003, and revealed spondylitic changes at L4-5 and L5-S1, without evidence of central canal or foraminal stenosis.  EMG and nerve conduction studies performed on May 2, 2003, were mildly abnormal, revealing borderline right carpal tunnel syndrome and some denervation in the right cervical paraspinal muscles.  By August 13, 2003, the plaintiff continued to complain of headaches. A CT scan of her brain on August 20, 2003, was normal. (R:142-48)

3

On August 26, 2003, Dr. Mate noted that the plaintiff had been taking Bextra and Skelaxin without significant improvement. However, the EMG and nerve conduction studies performed on the plaintiff were unremarkable and did not indicate the presence of cervical radiculopathy or carpal tunnel syndrome.   The doctor stated that the plaintiff should be able to resume light duty work. (R:148)

From May 8, 2003, until February 12, 2004, the plaintiff was treated monthly by Eduardo Suarez, M.D., at the Total Rehab and Medical Center in Boynton Beach, Florida. The plaintiff reported headaches and neck pain that radiated into the upper extremities, tail bone pain, memory loss, dizziness and blurry vision.   Dr. Suarez' initial physical examination revealed trigger points over the plaintiff's shoulder at the levator scapulae muscles and tenderness to the lumbar spine.   A more complete examination was performed on July 25, 2003, at which time Dr. Suarez diagnosed post-traumatic spinal sprain/strain, headaches and dizziness, vision problems and eye pain and anxiety.   He stated that the plaintiff was temporarily totally disabled. (R:160-75)

On September 2 and September 16, 2003, the plaintiff consulted with Steven D. Gelbard, a neurosurgeon.   Physical examination revealed tenderness and spasm in the plaintiff's cervical and lumbar spines.   She had bilateral sciatic notch tenderness.   The plaintiff could stand on her toes and heels and

4

bend at her knees, but these actions caused pain in her back and buttocks, respectively.   Range of motion in the cervical spine showed flexion at 30 degrees, extension at 10 degrees and rotation at 30 degrees, with pain.   Lumbar spine range of motion showed flexion at 30 degrees, extension at 10 degrees and lateral bending to 25 degrees, all with back pain.   The plaintiff's gait was normal and straight leg raising was positive at 30 degrees bilaterally. Motor examination, sensory examination and deep tendon reflexes all were normal.   (R:154-55)

Dr. Gelbard advised the plaintiff that one of her options was to continue with conservative treatment.   The plaintiff did not want to do this because she was in a lot of pain.   Dr. Gelbard told the plaintiff she was a candidate for an anterior cervical diskectomy and fusion at C5-6 and/or C6-7, as well as for a discogram at L4-5 and L5-S1 and possible percutaneous lumbar laser diskectomy.   The doctor explained all the risks of these procedures and suggested that the plaintiff think about her options. Ultimately the plaintiff decided against surgery.   (R:152-53)

On October 11, 2003, the plaintiff presented to McKinley Chesire, M.D., for psychiatric treatment.   Dr. Cheshire diagnosed post-concussive syndrome and depressive disorder, and prescribed Lexapro and Sonata.   The doctor listed the plaintiff's work status as "unable to work." Dr. Cheshire continued to treat the plaintiff until March 30, 2004, with the same diagnoses and prescribed

medication.  At that time, the plaintiff had exhausted her medical insurance coverage and treatment by Dr. Cheshire ceased. (R:176-93)

On February 12, 2004, Dr. Suarez noted that the plaintiff still was having problems with neck area and right-sided face pain. She continued to use a cane for ambulation and her gait remained slow.  The plaintiff exhibited blotches of the right upper extremity into the forearm area.  Physical examination revealed pain in the lumbar region, decreased motion in the cervical and lumbar regions, spasms in the cervical and lumbar spine and tenderness over the coccyx area.  Dr. Suarez' clinical impressions were status-post head trauma, cervical radiculitis, lumbar radiculitis and coccygodynia.  He recommended continued treatment by electrical muscle stimulation, hydro collator pack and mild stretching to the affected areas and he stated that the plaintiff would continue to be considered temporarily totally disabled. (R:158-59)

On April 12, 2004, a consultative psychological examination of the plaintiff was performed by Madelin Marrero Westerfeld, Psy.D.  Dr. Westerfeld observed that the plaintiff walked with a cane and her gait was slow.  The plaintiff's husband assisted her with recalling medical information, and the plaintiff exhibited a moderately impaired memory after a five minute delay, as well as slow mental processing speed.  As a result, Dr. Westerfeld opined that the plaintiff's memory might be reduced for

both novel and detailed information, secondary to pain experience and stress. The plaintiff's sustained attention and concentration were intact and she demonstrated no functional limitations in social interaction, adaptation, hearing or speaking. Dr. Westerfeld diagnosed Major Depressive Disorder, Single-Episode, Moderate and Pain Disorder associated with both psychological factors and a general medical condition. The doctor assigned a GAF score of 55. (R:194-98)

On April 19, 2004, a consultative physical evaluation of the plaintiff was performed by Salomon Levine, M.D. Physical examination revealed decreased range of motion in the neck, with lateral right movement decreased. The plaintiff had full range of motion in her upper and lower extremities. She walked with a cane, reportedly on the advice of her neurologist, but stated that she did not need it all the time. The plaintiff's grip was four kilograms in each hand. She could not open a tightly sealed jar, but could turn a doorknob, insert a key, pick up coins and button/unbutton. The plaintiff was able to walk on her heels, on her toes and heel to toe. Leg raises seated and supine were within normal limits. There was decreased motor strength (3/5) in the plaintiff's right leg. Mental status was normal and the plaintiff's mood was good. Dr. Levine's diagnostic impressions were neck pain and head trauma. (R:199-202)

On June 10, 2004, a non-examining State Agency physician completed a Physical Residual Functional Capacity Assessment of the plaintiff.  The doctor opined that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  She could stand and/or walk for about six hours in an eight-hour workday and sit for the same amount of time during a workday.  The plaintiff had an unlimited ability to push and/or pull, and could occasionally climb, balance, stoop, kneel, crouch and crawl.  She had no environmental limitations except that she had to avoid even moderate exposure to hazards such as machinery and heights because of her unstable gait.  The plaintiff's symptoms were attributable to a medically determinable impairment resulting from her fall in February 2003.  (R:207-14)

On October 18, 2004, M. De Cubas, Ph.D., a State Agency reviewing psychologist completed a Psychiatric Review Technique form.  Dr. De Cubas concluded that the plaintiff had a non-severe medically determinable impairment with a coexisting non-mental impairment.  The psychologist opined that the plaintiff had mild restrictions in activities of daily living and mild difficulties in maintaining concentration, persistence or pace.  She had no difficulties in maintaining social functioning and no episodes of decompensation.  Dr. De Cubas noted that the plaintiff felt depressed because she could not function as before and experienced mental symptoms when in pain. (R:215-27)

8

A second consultative physical examination of the plaintiff was performed on February 10, 2005, by Kenneth Rivera-Kolb, M.D. Dr. Kolb's examination of the plaintiff's neck revealed full range of motion active in all four quadrants. There was no tenderness and no limitations of motions. Examination of upper extremities showed full range of motion at the shoulder, with mild impairment post-rotation on the right. There was full range of motion in the lower extremities, with normal leg raising in the supine position. The plaintiff exhibited mild to moderate tenderness in the coccygeal area of her back and decreased anterior flexion. The plaintiff was able to open a tightly sealed jar, turn a doorknob, insert a key into a lock, pick up coins and button/unbutton. She had a handgrip of 10 pounds with the right hand and 20 pounds with the left. She could walk on her heels, toes and heel-to-toe. Mental status was normal, but mood was depressed. Dr. Rivera-Kolb's diagnostic impression was cervical root syndrome, coccydynia and history of cervical disc disease. (R:229-32)

A second consultative psychological examination of the plaintiff was conducted by April Kassover, Ph.D., on February 12, 2005. Dr. Kassover found that the plaintiff's cognitions were intact. She had good long term memory. There were no hallucinations, delusions, bizarre mentations or psychosis. The plaintiff's thoughts were rational and coherent. She spoke in a

calm, clear fashion devoid of tears, tremors or rushed, pressured speech. There was no acute anxiety, anger or paranoia. The plaintiff walked unassisted and spoke clearly and fluently in accented English. The plaintiff's reported daily activities were making coffee, talking, walking a little, praying, doing light chores, watching TV, watering her garden and talking on the phone. The plaintiff could clean for 45 minutes if she was feeling good. Dr. Kassover's diagnostic impression was psychological disorder (depression) associated with physical pain disorder, with prognosis and motivation fair to good. (R:237-38)

On February 22, 2005, Cheryl A. Woodson Johnson, Psy.D., a reviewing State Agency psychologist, completed a Psychiatric Review Technique form. Dr. Johnson agreed with the other reviewing psychologist, Dr. De Cubas, that the plaintiff had a non-severe mental impairment and a coexisting non-mental impairment. She found that the plaintiff suffered from depression, characterized by sleep disturbance and supported by the medical record, as well as pain disorder. Dr. Johnson opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R:239-50)

On March 4, 2005, Karen F. Kuhns, M.D.,a non-examining State Agency physician completed a Physical Residual Functional

Capacity Assessment of the plaintiff.  Dr. Kuhn's primary diagnosis was cervical and lumbar strain; her secondary diagnosis was closed head injury.  The doctor opined that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  She could stand and/or walk, or sit for about 6 hours during an 8-hour workday, and had an unlimited ability to push and/or pull.  The plaintiff had no postural limitations and an unlimited ability to handle, finer and feel.  The plaintiff's ability to reach with her right arm was limited by decreased range of motion in the right shoulder and neck pain.  The plaintiff had no environmental limitations.  (R:251-58)

Dr. Kuhn based her conclusions on the fact that a CT scan of the plaintiff's brain was negative; MRI of the cervical spine showed herniations at C4-5 and C5-6; EMGs of the lower extremities revealed no radiculopathy; consultative examination in February 2005 indicated decreased range of motion in the cervical spine and right shoulder, with minimally decreased range of motion in the lumbar spine.  Neurological examinations, as well as dexterity and gait, were normal.  (R:252)

On April 18, 2006, the plaintiff presented to the Hendry-Glades Mental Health Clinic for initial evaluation.  A licensed social worker noted that the plaintiff's affect was restricted and her mood was depressed.  Otherwise, all indicators were normal. The plaintiff reported that she was depressed, tearful and suffered from low self-esteem, diminished interest in and enjoyment of

activities, feelings of helplessness, worthlessness and inappropriate guilt, and mood-related persecutory delusions. Initial diagnosis was Mood Disorder due to Chronic Pain with Depressive and Psychotic Features, and a GAF score of 48. (R:273-81)

Following the intake evaluation, on May 26, 2006, the plaintiff was examined by psychiatrist Ovide-Henri Bernadotte, M.D. Dr. Bernadotte's diagnosis was Major Depressive Disorder, Recurrent, Moderate, with a GAF score of 55. He prescribed Celexa and Trazodone. Dr. Bernadotte continued to treat the plaintiff for depression through December 21, 2006, at which time the plaintiff was taking Lexapro and Trazodone. (R:282-87)

On December 21, 2006, Dr. Bernadotte completed a form entitled Medical Assessment of Ability to Do Work-Related Activities (Mental). In that form, Dr. Bernadotte opined that the plaintiff had a fair ability to follow work rules, relate to co-workers, interact with a supervisor and maintain attention/concentration; a good ability to use judgment and function independently, and a poor ability to deal with the public and deal with work stresses. She had a fair ability to understand, remember and carry out detailed, but not complex, job instructions and to understand, remember and carry out simple job instructions, but a poor ability to understand, carry out and remember complex job instructions. The plaintiff had a good ability to maintain

12

personal appearance and demonstrate reliability, but only a fair
ability to behave in an emotionally stable manner and to relate
predictably in social situations.  Dr. Bernadotte stated that,
according to the plaintiff, she became depressed after her physical
injuries made it impossible for her to return to work. (R:259-61)
In a communication to the Social Security Administration, Dr.
Bernadotte emphasized that the plaintiff's depression was secondary
to her inability to work due to her physical limitations.   He
stated that the disability determination should be based on the
plaintiff's physical, rather than her emotional problems. (R:292)

Additional records from Dr. Suarez, dated December 18,
2006, January 8, 2007, and February 2, 2007, indicate that the
plaintiff continued to suffer from cervical, lumbar and coccyx
pain, with cervical radiculitis, right carpal tunnel syndrome,
right hand swelling and right arm numbness. (R:269-71)  On February
5, 2007, Dr. Suarez completed a form entitled Medical Assessment of
Ability to Do Work-Related Activities (Physical).  The doctor
opined that the plaintiff was able to lift 8 pounds occasionally
and she could stand/walk or sit for no more than 30 minutes during
an 8-hour workday.  The plaintiff could never climb, balance,
stoop, crouch, kneel or crawl and could not reach with her right
hand.  Environmental restrictions included humidity and vibration,
and the plaintiff also had symptoms of right carpal tunnel

syndrome.  Dr. Suarez did not believe the plaintiff could perform even sedentary work. (R:263-66)

In a letter dated May 24, 2007, Dr. Suarez responded to the ALJ's request that he clarify his February 5, 2007, medical assessment.   The doctor explained that his opinion of the plaintiff's limitations was based upon the MRI of her cervical spine, which demonstrated degenerative bulging disc at C5-C6 and C6-C7, with mild cord flattening and right foraminal stenosis and C6-C7. The plaintiff's complaints focused on pain in her right upper extremity, low back and tail bone.  Dr. Suarez believed that the plaintiff would have continued problems with pain and weakness in her spinal structures and would have days of absenteeism due to the pain. (R:297)

At the administrative hearing, the ALJ elicited testimony from two experts.  The first was Dr. John Griscom, a medical expert (ME).   Dr. Griscom began by summarizing the medical and psychological evidence in the record.  (R:374-81)  During the course of that summary, Dr. Griscom expressed his view that based on the scans which had been performed on the plaintiff, Dr. Gelbard's suggestion that the plaintiff consider cervical and lumbar surgery was "a little aggressive." (R:377)  As to the plaintiff's mental health, Dr. Griscom stated that it appeared that the plaintiff's memory dysfunction had improved and that she had responded well to medication.  (R:380)  Dr. Griscom testified that

14

there were no findings or opinions which were in conflict or inconsistent with the record, although there was disagreement about whether the plaintiff was able to perform either light or sedentary work. (R:381) The ME did not express his own opinion regarding the plaintiff's residual functional capacity.

In response to questions posed by the plaintiff's counsel, Dr. Griscom stated that the plaintiff suffered from bulging, rather than herniated, cervical discs. (R:382) The doctor also stated that it was possible to have memory loss that would not show up on an MRI of the brain. (R:384-87)

The ALJ also called upon a vocational expert (VE), Dr. Howard Feldman. Dr. Feldman stated that the plaintiff's prior occupation of agricultural worker is classified by the DOT as medium unskilled work. The ALJ then asked the VE to assume a hypothetical claimant of the same age, education and work experience as the plaintiff with light exertional limitations and who could never climb ladders, ropes and scaffolds. This individual would have occasional other postural limitations and would be required to avoid even moderate exposure to hazards such as machinery and heights. Dr. Feldman testified that such a person could not perform the plaintiff's past relevant work, but there were jobs in the local and national economy that the hypothetical claimant could perform, such as fast food worker and packager in a factory. (R:388-89)

Next, the ALJ asked the VE to assume that the individual was restricted to sedentary work. Dr. Feldman stated that such a person would be able to do bench assembly work and electronics work. Both jobs existed in significant numbers nationally and locally. (R:389-90) Finally, the ALJ asked Dr. Feldman to assume that the hypothetical claimant had the limitations described by Dr. Suarez. The VE stated that such a person could work only in a sheltered, rather than a competitive environment. Regarding each of these hypotheticals, Dr. Feldman's testimony would not be different based on the individuals inability to speak English. (R:389-91)

The plaintiff testified on her own behalf with the assistance of an interpreter. In response to the ALJ's query about what she did each day and how she took care of herself, the plaintiff stated that it depended on how she felt when she got up. The plaintiff explained that if she could do something, if she could fix herself something to eat, she would do so. Everything depended upon the pain. The plaintiff testified that she tried to cook, but did not clean a lot because she could not do it. The plaintiff's husband and daughter did the cleaning. (R:392-93)

Responding to her lawyer's questions, the plaintiff testified that most of her pain was in her neck and her head, and that sometimes when she woke up she was unable to move her arms. She stated that she has worked all her life and sometimes she felt

16

desperate because she was unable to do the things she had done before.  The plaintiff related that during the day she made coffee, watched TV, went to church and read the Bible.  She could walk for about one block, and tried to walk because often it was less painful than sitting or lying down.  Sometimes she would lie down on the floor and stretch when she felt like she needed to take a pill for the pain. (R:394-95)

## III. **DECISION OF THE ALJ**

The ALJ first found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2008, that she had not engaged in substantial gainful activity since her alleged disability onset date of February 8, 2003, and that she had degenerative disc disease, a severe impairment. (R:20)

Next, the ALJ found that the plaintiff's mental impairment was not "severe" as defined by the Social Security regulations.  He noted that Dr. Westerfeld found that the plaintiff was alert and oriented to person, place, time and situation; her remote memory was good and her recent memory was moderately impaired; her immediate auditory attention and concentration for a simple mental tracking task was within normal limits; her sustained attention and concentration was intact, and she demonstrated no functional limitations in social interaction, adaptation, hearing or speaking.  Additionally, Dr. Westerfeld stated that the

17

plaintiff's activities of daily living were restricted more by her physical impairments than her mental impairments.  The ALJ also pointed out that the State Agency psychologists concluded that the plaintiff's mental impairment was "not severe" because it involved only mild functional limitations.  The ALJ gave great weight to the opinions of these psychologists because good explanations were provided for them. (R:20-21)

With regard to the plaintiff's physical impairments, the ALJ found that she did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ stated his conclusion that the plaintiff had the residual functional capacity to lift twenty pounds occasionally and ten pounds frequently, and could stand and walk for six hours and sit for six hours during an eight-hour workday.  She could not climb ladders, ropes or scaffolds, but could balance, stoop, kneel, crouch and crawl occasionally.  The plaintiff was required to avoid even moderate exposure to hazards such as moving machinery and unprotected heights.  (R:21)

In support of this conclusion, the ALJ stated that the plaintiff's testimony was not credible.  He found that the plaintiff was "extremely evasive during her testimony" and noted that the plaintiff had provided inconsistent information about her ability to speak and understand English and about her educational

level. (R:23)  Despite her evasions, the plaintiff "finally
admitted to driving, going to church, cooking and cleaning,"
activities which "belie her allegation of total disability." Id.
Additionally, the plaintiff betrayed no evidence of pain or
discomfort during the hearing.  The ALJ acknowledged that "the
hearing lasted less than one hour and cannot be considered a
conclusive indicator of the claimant's overall level of pain on a
day-to-day basis," he nevertheless gave her apparent lack of
discomfort "some slight weight in reaching the conclusion regarding
the credibility of the claimant's allegations and her residual
functional capacity." Id.

The ALJ emphasized that approximately six months after
the plaintiff's injury, Dr. Mate, a board certified neurologist,
opined that the plaintiff should be able to resume light duty work.
The ALJ gave little or no weight to Dr. Suarez' opinion that the
plaintiff could not perform even sedentary work because it was not
supported by medically acceptable clinical and laboratory
techniques and was inconsistent with other evidence of record.
Specifically, an MRI of the plaintiff's cervical spine showed only
bulging discs, and EMG and nerve conduction studies did not
indicate the presence of cervical radiculopathy or carpal tunnel
syndrome. (R:23-24)

The ALJ noted that some doctors will express an opinion
in order to please a patient for whom the doctor feels sympathy, or

who has become insistent or demanding.  The ALJ stated that although "it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record," as in the plaintiff's case. (R:24)

The ALJ also gave little weight to the opinion of Dr. Bernadotte, who opined that the plaintiff could not deal with the public or with work stresses, and that her ability to understand, remember and carry out simple job instructions was only fair.  the ALJ pointed out that Dr. Bernadotte had stated that the plaintiff's depression was secondary to her inability to work due to physical limitations, and that the plaintiff's eligibility for disability should be based on her physical ailments, rather than emotional problems. (R:24)

The ALJ gave great weight to the opinions of the State Agency medical consultants, who found that the plaintiff could lift up to twenty pounds occasionally and up to ten pounds frequently, could stand and/or walk for six hours and sit for six hours during an eight-hour workday.  These consultants also found that the plaintiff could not climb ladders, ropes or scaffolds, but could occasionally climb stairs, balance, stoop, kneel, crouch and crawl. The ALJ found that the State Agency consultants presented relevant evidence and good reasons to support their opinions. (R:24)

In summary, the ALJ stated that examining physicians had found the plaintiff to be neurologically intact, and objective tests such as MRI and EMG had been only minimally abnormal. The plaintiff had described daily activities that were not limited to the extent one would expect in light of her complaints of disabling pain and limitations. A neurosurgeon had told the plaintiff that she was a candidate for surgery on her neck, but she had elected to receive conservative treatment instead. In light of these facts and the great weight afforded to the State Agency medical consultants, the ALJ concluded that the plaintiff could perform light work with some postural limitations. (R:24-5)

Next, the ALJ found that the plaintiff was unable to perform any of her past relevant work, that she was a "younger individual" on the alleged disability onset date and that transferability of skills was not material because, using the Medical Vocational Guidelines as a framework, the plaintiff was not disabled regardless of whether she had transferable job skills. (R:25) Based on the testimony of the VE, the ALJ concluded that considering the plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. Therefore, the plaintiff was not under disability from her alleged onset date of February 8, 2003, through the date of the ALJ's decision. (R:25-6)

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on five grounds: (1) there was no evidence to support the ALJ's finding that the plaintiff's mental impairment was "non-severe;" (2) the ALJ erred by according greater weight to the opinions of the State Agency reviewing physicians and psychiatrists than to the opinion s of the plaintiff's treating physicians and psychiatrists; (3) the ALJ's residual functional capacity assessment was not supported by substantial evidence; (4) the ALJ erred by posing an incomplete hypothetical to the VE, and (5) the ALJ's credibility finding was not supported by substantial evidence.

The Commissioner argues that the ALJ's decision should be affirmed because it was supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence.  "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985).  Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).  The Court

must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

## A. **Mental Impairment**

The plaintiff's first asserted ground for relief is that the ALJ erred in finding that her mental impairment was "non-severe."  The plaintiff points out that one of the State Agency reviewing psychologists found that she had a mild degree of limitation in restriction of actions of daily living, mild degree of limitation in maintaining social functioning and a mild degree of difficulty in maintaining concentration, persistence or pace and no episodes of decompensation.  Based on these findings, the plaintiff argues that she presented a colorable claim of mental impairment, requiring the ALJ to complete a Psychiatric Review Technique Form and either append the form to his decision or incorporate its mode of analysis into his findings and conclusions.  Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005).

An impairment is "not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the plaintiff's ability to work, irrespective of age, education or work experience."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).  Step two "allows only claims based on the most trivial impairments to be rejected."  McDaniel, 800 F.2d at 1031.  As a result, the "claimant's burden at step two is mild."  Id.

24

In the instant case, the ALJ gave great weight to the opinions of the State Agency psychologists, both of whom explicitly found that the plaintiff's mental impairment was "non-severe." Additionally, the ALJ emphasized that Dr. Westerfeld found that the plaintiff was alert and oriented to person, place, time and situation; her remote memory was good and her recent memory was moderately impaired; her immediate auditory attention and concentration for a simple mental tracking task was within normal limits; her sustained attention and concentration was intact, and she demonstrated no functional limitations in social interaction, adaptation, hearing or speaking.  The ALJ also noted that Dr. Westerfeld had opined that the plaintiff's activities of daily living were restricted more by her physical impairments than her mental impairments.  Finally, the ALJ pointed out that the plaintiff's treating psychiatrist, Dr. Bernadotte, had stressed the plaintiff's depression was secondary to her inability to work due to physical limitations, and that the plaintiff's eligibility for disability should be based on her physical ailments, rather than emotional problems.

Considering these factors and the record as whole, there was substantial evidence in the record to support the AlJ's finding that the plaintiff's mental impairment was not severe, and the plaintiff is not entitled to relief on this ground.

B. **Opinions of Treating Physicians and Psychiatrists**

The plaintiff next contends that the ALJ erred by according greater weight to the non-examining State Agency physicians and psychiatrists than to those of her treating physicians and psychiatrists.  The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 C.F.R. §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records.  <u>Lewis</u>, 125 F.3d at 440; <u>Jones v. Department of Health & Human Services</u>, 941 F.2d 1529, 1532-3 (11th Cir. 1991); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991).

Regarding the plaintiff's physical limitations, the ALJ gave little or no weight to the opinion of Dr. Suarez, one of the plaintiff's treating physicians, who stated that the plaintiff lacked the capacity to perform even sedentary work.  The ALJ found that Dr. Suarez' opinion was not supported by medically acceptable

clinical and laboratory techniques and was inconsistent with other evidence of record.   Specifically, an MRI of the plaintiff's cervical spine showed only bulging discs, and EMG and nerve conduction studies did not indicate the presence of cervical radiculopathy or carpal tunnel syndrome.   Additionally, the ALJ noted that six months after the plaintiff's injury, Dr. Mate, a board certified neurologist, opined that the plaintiff should be able to resume light duty work.

The ALJ pointed out that examining physicians had found the plaintiff to be neurologically intact. The plaintiff had described daily activities that were not limited to the extent one would expect in light of her complaints of disabling pain and limitations.   Finally, a neurosurgeon had told the plaintiff that she was a candidate for surgery on her neck, but she had elected to receive conservative treatment instead.

Regarding the plaintiff's mental impairment, the ALJ assigned little weight to Dr. Bernadotte's assessment that the plaintiff could not deal with the public or with work stresses, and that her ability to understand, remember and carry out simple job instructions was only fair.  As noted in the preceding section, the ALJ relied on the contrary opinions of Dr. Westerfeld, a consulting psychologist, and of the two reviewing State Agency psychologists. Additionally, the ALJ pointed out that Dr. Bernadotte had stated that the plaintiff's depression was secondary to her inability to

27

work due to physical limitations, and that the plaintiff's
eligibility for disability should be based on her physical
ailments, rather than emotional problems.

The undersigned finds that the ALJ articulated good cause
for assigning little or no weight to the opinions of Dr. Suarez and
Dr. Bernadotte by demonstrating that the opinions of these doctors
were not supported by the medical evidence of record. Accordingly,
remand is not required for failure to give proper weight to the
plaintiff's treating physician and psychiatrist.

## C. Residual Functional Capacity Assessment

Next, the plaintiff argues that the ALJ improperly
assessed the plaintiff's residual functional capacity because he
found her mental impairment to be non-severe and ignored multiple
references to the plaintiff's need for a cane, as well as other
limitations involving the plaintiff's ability to reach with her
right arm and decreased grip strength.

As discussed earlier in this Report, there was
substantial evidence to support the AlJ's finding that the
plaintiff's mental impairment was "non-severe." Additionally, the
record does not support the plaintiff's contention that she could
not walk without the aid of a cane. The plaintiff told Dr. Levine,
a consultative physician, that she used a cane on the advice of her
neurologist, but stated that she did not need it all the time.
Although the plaintiff's neurologist, Dr. Mate, may have prescribed

the cane, Dr. Mate also released the plaintiff could to light duty work six months after the date of her injury.  Dr. Kassover, a consultative psychologist, noted that the plaintiff came to her appointment on February 12, 2005, without an assistive device.

At the hearing, the plaintiff testified that her primary problems stemmed from pain in her neck and head.  This fact, combined with additional factors cited by the ALJ in support of his decision to accord little weight to the opinion of Dr. Suarez (and discussed in the preceding section of this Report), constitute substantial evidence in the record to support the AlJ's residual functional capacity assessment.

## D. **Incomplete Hypothetical**

The plaintiff's fourth asserted error is that the ALJ posed to the VE a hypothetical which omitted mention of her memory impairment, depression, pain, inability to reach in all directions, inability to hold objects and inability to ambulate without a cane. This argument is based on the plaintiff's claim, addressed earlier in this Report, that the ALJ incorrectly assessed the plaintiff's mental impairment and her residual functional capacity.  Since there is substantial evidence in the record to support the ALJ's finding that the plaintiff's mental impairment was not severe and his determination of her physical residual functional capacity, there likewise is substantial evidence to support the hypothetical presented to the VE.

**E.** **Credibility of The Plaintiff**

        The plaintiff's final contention is that the ALJ improperly found her to be incredible based on the ALJ's perception that the plaintiff was evasive in her answers and that she showed no signs of discomfort during the hearing, citing <u>Freeman v. Schweiker</u>, 681 F. 2d 727, 731 (11th Cir. 1982). The plaintiff argues that she answered the ALJ's questions in a forthright manner and accurately described the nature of her pain and limitations. The plaintiff contends that her testimony was fully supported by the medical evidence of record.

        The ALJ must consider a claimant's subjective testimony regarding pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain. <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992); <u>Mason v. Bowen</u>, 791 F.2d 1460, 1462 (11th Cir. 1986); <u>Landry v. Heckler</u>, 734 F.2d 1551, 1553 (11th Cir. 1986). However, the ALJ may reject a claimant's testimony regarding pain as not credible, and that determination must be upheld if it is supported by substantial evidence. <u>Wilson v. Heckler</u>, 734 F.2d 513, 517 (11th Cir. 1984).

        In <u>Freeman</u>, <u>supra</u>, the court found that the ALJ improperly substituted his judgment for that of the medical and

vocational experts.   The court noted that this approach is erroneous for several reasons.

> First, it is well established that "pain unaccompanied by any objectively observable symptoms may be so real and so intense as to be disabling so as to support a claim for disability benefits." *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976), (citing Brandon v. Gardner, 377 F.2d 488 (4th Cir. 1967)). The AlJ's decision improperly suggests that unless pain is visible to the ALJ at the hearing, it is proper to deny the claim.

> Second, the ALJ engaged in what has been condemned as "sit and squirm" jurisprudence. In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing.   If the claimant falls short of this index, the claim is denied.

Freeman, 681 F.2d at 731.

In the instant case, the ALJ did point out that the plaintiff showed no signs of discomfort during the hearing, but also acknowledged that this fact could not be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis.   Accordingly, the ALJ determined that the plaintiff's lack of discomfort should only be given slight weight in assessing her credibility. Based on the minimal weight assigned to the plaintiff's observed behavior at the hearing, the undersigned finds that the ALJ did not base his determination on the type of "sit and squirm" jurisprudence condemned by Freeman, supra.

Regarding the ALJ's comments that the plaintiff was evasive in her responses, the record reflects that the plaintiff's testimony was brief and lacking in detail. Additionally, the plaintiff testified with the use of an interpreter despite the fact that on February 12, 2005, Dr. Kassover noted that the plaintiff's English accented but fluent. Beyond these observations, it is difficult to ascertain from a cold record whether the plaintiff's testimony was evasive.

In any event, the ALJ also based his credibility assessment on the plaintiff's daily activities, the assessment of Dr. Mate that the plaintiff was capable of light duty work within six months of her injury, the absence of abnormal test results other than one which showed two bulging discs, the plaintiff's decision to forego surgery and the results of physical examinations performed by the plaintiff's treating and consulting physicians.

Based on these factors, the ALJ was entitled to conclude that there was no objective medical evidence to confirm the severity of the plaintiff's alleged pain and that the plaintiff's objectively determined medical condition was not of a severity that can reasonably be expected to give rise to the pain she described. Therefore, the ALJ's assessment of the plaintiff's credibility did not constitute reversible error, and his determination that the plaintiff was not entitled to disability benefits should be affirmed.

## VI. <u>CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Summary Judgment (DE 16) be DENIED, and the Commissioner's Motion for Summary Judgment (DE 20) be GRANTED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. <u>LoConte v. Dugger</u>, 847 F.2d 745 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 958 (1988); <u>RTC v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 26th day of June, 2009.

_Lurana S. Snow_
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE


Lilli Marder, Esq. (P)
AUSA Lawrence Rosen (MIA)